Good morning, your honors. Guy Wallace for Plaintiffs and Appellates. And with me is Mr. Michael Thomas. And the pronunciation on that actually is Delodder. May it please the court. The district court erred in this matter by failing to give great weight to the evidence showing the company's centralized policies, procedures, checklists, forms, and written training materials. The evidence of those written policies and procedures amply show that Aerotek's operations are highly standardized and that those policies, procedures, checklists, forms, and written training materials identify and also largely control the job duties and tasks that are done by the proposed class of recruiters. So the district court did identify factual differences of what individual employees was doing. Are you saying that the district court was wrong in identifying those differences or that those differences were not, didn't make a difference? We are saying that those differences did not make a difference, your honor. And we are also saying that the district court erred legally by misplacing the emphasis of its analysis. Under Wells Fargo and Vinol, great weight is to be accorded to the company's policies, procedures, and training materials if they are uniform, detailed, and if they are followed in the workplace. And if that is true, then that would appear to be the most important factor in assessing the relative commonality of a group of employees. Here, instead of focusing on those policies and training materials that identify how people do the job across the entire group of 700 people, the district court misplaced its focus by zooming in on essentially eight employees that are cited in the order. And even within those eight out of the 700, pretty much any variation was apparently assumed to be a disqualifying individual issue as opposed to something  that was not a disqualifying individual issue. So the district court was focusing on things that the district court thought went to exercise of independent judgment, which I guess under the California cases would indicate whether it was discretionary or not discretionary, or exercise of discretion or not. Why was that wrong to focus on those sorts of issues? Well, quite apart from, let's take the example of whether someone sources the database or does networking. Under the Aerotech recruiting process, there's only one method for how a recruiter goes about trying to find the candidate. And there's even actually a game plan form that they are trained on in the training. So while the district court would point to say, well, some, a few recruiters went to the databases, others did networking, the key here is that they were all using the Aerotech recruiting process that they were trained on. And even their selection among those databases or approaches to finding the candidate that they're supposedly choosing among, there's something that they're trained on in the game planning process, which is a module in the training that's over three months long that they all take, they all have to pass. We all went to law school, but lawyers do things in very different ways. So I'm not sure that by continuing to go back to the training program and the training manual, you really speak very clearly to how people do the jobs. Well, in addition to the training, as part of it, there are ten checklists and forms, Your Honor. We start with the requirement form, and that gives you the fields that you're going to fill for a potential candidate. From there, you go to building a game plan. These are all in the record. From there, there is an interview checklist, and that's for both. Some of which are followed and some of which aren't. There are always mandatory minimum questions within the personal interview and the telephonic interview that have to be asked. Sometimes there are occasionally follow-up questions that go beyond that checklist, Your Honor. But there's nothing in the Court's opinion that suggests that any additional questions subtract from the fundamental list of questions that you're required to ask. Similarly, there's a G2 form where you have to fill out all the fields of information that are pertinent to a particular position that needs to be filled. There is a resume review checklist, a reference check checklist, a pre-submittal checklist, a submittal checklist, and so forth. All of these are two-, three-, four-page forms with multiple steps that the recruiters have to follow and complete as part of the sourcing and screening process for the candidates. Now, we know that the checklists, which are contained within the training and which are also available as a desk reference on the job, are followed in the workplace. They reflect the realities of the workplace, as this Court has previously indicated in the standard, by four bodies of proof that were submitted at the district court level. The first is the documents themselves. For example, the training materials state- Now, stop, because the training materials state this is the training material doesn't prove the training materials actually followed. I mean, Ramirez tells us to look at how the employees actually spend their time. So what do we have with regard to how the employees actually spend their time? We have the checklists. We also have testimony of corporate officials. For example, official Fujimoto. The modules are online. The online training materials outline basically what the process is for recruiting and how a recruiter would go about their job. So the district court seemed to focus more on testimony about how people in the field, what people in the field said they were actually doing, and the district court found variations based on whether there was different types of supervisors. So maybe in one of the various locations, the employees had less discretion. In another location, they had more discretion depending on the supervisor. And so was the district court not entitled to look at that information in deciding that there wasn't a common question across the board? Okay. With respect to the supervision, the supervision takes place within a standard operating procedure of two red zone meetings per day plus a daily triangle meeting, Your Honor. And the focus of those meetings is short-term daily production and also whether Aerotech recruiters are following the standard recruiting process that's outlined in the checklists and forms to make sure that they're doing the recruiting process the Aerotech way, which is something that is marketed to the clients. Given that quantity and degree of supervision, which the district court found in its opinion is something that every recruiter is subject to. In fact, the district court said that that standard operating procedure of the red zone meetings and the daily triangle meetings was a common procedure across the class, susceptible to common proof. We think that that degree of supervision may preclude the company from making out that prong of the administrative exemption. And if that were true, its defense in this case would fail, generating a common answer to a common question, perhaps even a predominant one. Going back to the checklist and how we know they do it the Aerotech recruiting process way, Vice President of Training Flanagan said, you have to master the training. And if you don't, your training will be extended or you're going to be terminated. And that's because the training lays out all the steps of how you do the job. And when you go into the job, you do it the way you were trained. That was the purpose of the training. That's why it's mandatory. That's why it's three months long. That's why every single recruiter gets the training. It is the only formal training they ever receive. They are able to recruit in different divisions or offices based on that training. It makes them fungible. So if the training manual or the policies and procedures of a particular employer, not just one, say, said every employee will have extensive discretion in these 12 areas, but in fact those employees don't. The way they work on the job, they're very constrained by the supervisors. Would they be unable to make the argument that they were exempt or non-exempt employees because of the binding effect of the policies and procedures? In that instance, I think looking at the language of the prong, perhaps the experience of the employee would not reflect the realistic requirements and expectations of the employer. But that's not the circumstance we have here. We know that there are 400 pages of training that they go through over three months that contain the detailed checklists I told the court about, and we know through the red zone meetings that happen daily and the triangle meeting that they're expected to follow those checklists, and they are prescriptive. But the training manuals themselves, you'd say, are not dispositive. So you do agree, and which I think our cases have said, that you need to look at what's happening on the ground. So is your argument just that what's happening on the ground is not as the district court found it or the district court made a legal error? I didn't get through all the bodies of proof that the training and the checklist reflect the realities of the workplace. Also, when you look at the people who are deposed, all of them testified at one point or another in their deposition that they follow the training which contains the AeroCheck recruiting process, that they follow the checklist, that they do this job the AeroCheck way. As recruiter lead Michelle Marshall put it, with respect to how indoctrinated they are on this particular set of materials, it is like teaching them how to walk. You just keep walking them through it until they memorize it. They have memorized those materials. They used the checklist on the job. That is how we know that those materials are, by and large, controlling what takes place. And if you examine the district court's opinion, there is no finding in there that the training and checklists are not followed in the workplace. There are instead these eight examples which may not identify items of consequence. It's not enough under the substantive legal standard to identify a variation. With respect to whether someone is doing something slightly differently, like asking additional questions beyond the mandated ones, is that a matter of significance? And then beyond that, there is still a quantitative issue of whether the employees are customarily and regularly exercising discretion on that item. So the types of variations that the district court identified would engender further common questions about whether that's a matter of significance. And then also, is this customarily and regularly taking place? And when you're looking at eight employees out of a proposed class of 700, that's a pretty thin basis for discounting the great weight that's supposed to be placed on the common written policies and checklists that detail how a job is done and that we have evidence showing the company requires that the employees perform it that way in the workplace. How much are this group of employees, the recruiters, what do they get paid? Their compensation, as I understand it, is in the range of about $40,000 a year, Your Honor. And I think they work somewhere between 50 and 60 hours a week. They are entry-level employees. This is the recruiter one position that we're talking about. They sit at the bottom of the triangle. The account manager is above them, and then above the account manager is the director of business operations, the DBO. Supposedly, the three components of the triangle are all exempt, which would appear to be quite improbable. We think that with that 400 pages of training material and the checklists, which they do admittedly apply in the course of doing their jobs, that we have a viable form of common proof that these recruiters resemble the personnel clerk example in the regulations, particularly with respect to the sourcing, the non-exempt personnel clerk is the one I have in mind, particularly with respect to the sourcing and screening aspects of how they do their job, which are so closely scripted by the checklists. Common questions would appear to arise based on the policies and checklists and forms with respect to identifying the basic tasks and duties of the position, the employer's realistic expectations and the realistic requirements of the job, the degree to which recruiters are able to exercise discretion within such a tightly controlled framework of the checklists and the daily red zone meetings and triangle meetings. The degree of supervision, as the district court observed, they are all subject to the standard operating procedure of having the twice daily meetings for red zone and for the triangle meeting. That would also appear to be a common question. Given those common questions, we think if the employer were to fail on any one of those prongs of the defense, again, the employer would lose its defense because it has to make out every single prong. So we think we've shown a predominance of important questions, and we've shown several of them, and the district court erred by failing to accord great weight to the written policies, procedures that control the workplace. Which prong do you think is the strongest from your perspective that can be dealt with on a class basis that doesn't have greater individual concerns? The first prong the district court found satisfied commonality. The district court did not consider the possibility of a C-4 certification. We also think the supervision prong, the general supervision prong, is very strong for us, Your Honor, followed probably by the discretion prong. And those three certainly would appear to be strong candidates for a C-4 certification. Because sourcing and screening, which are the most basic tasks that the recruiters perform, comprise more than 50 percent of the time that they work, that one may also, the primary duty prong may also be appropriate for class certification. I think I'll reserve the remainder of my time. Okay? Good morning, Your Honors. May it please the Court, in this case, the district court carefully reviewed the evidence, made factual findings that are not clearly erroneous, applied the correct law to the facts, and made a decision to deny certification that was not an abuse of discretion. What the plaintiffs are asking this Court to do is to reject the district court's factual findings by looking only at certain evidence that they presented and ignoring any of the evidence that doesn't support their theories. And this approach would be wrong for two reasons. First, I think, if you just look at the recent law with Ellis v. Costco and Dukes, which talks about how the Court has to rigorously review all the evidence, it would have been a clear error to just look at the evidence the plaintiffs want you to look at. And the Court didn't do that here. The Court said, no, I need to look at everything. I mean, and an example here of what I think is significant is that the ‑‑ some of the evidence, the plaintiffs keep saying, oh, there's only eight people that defendants are relying on. If you actually look at the district court's findings and who she's talking about, it's plaintiffs' own witnesses. So it's about 20 people. And there are plenty of places along the way where she says, plaintiffs' own witnesses don't even support this idea that everybody is uniformly doing the same thing the same way. So I understood opposing counsel to say that, well, even if the district court was correct in seeing this range of variations, those variations don't make a difference for purposes of determining whether they meet the standard. Yeah, and they make an absolute difference. And I think the recent Supreme Court case of Harris v. Superior Court, I think, really points this up. That was a case where the Court reversed a class-wide determination that everybody was exempt and said, you know, no, the evidence doesn't support that sort of determination. But they talked about what sorts of duties qualify for the administrative exemption. And they're exactly the types of duties here that the Court found variations in. For example, one is advising management. And the Court, if you look at the Court's ruling, you're finding all sorts of variations on whether people are either making recommendations to hire people or actually making decisions to hire people, either to their manager or to the client. And as Harris points out, making those kinds of recommendations or decisions can be to either the employer or the employer's customer. So that's one example where the differences absolutely matter. Harris also talks about representing the company as being something that can qualify for the administrative exemption. So, again, here the Court talked about variations in how much client contact there was and said, on this record, some people have a lot of client contact and are, you know, advising the client about issues, personnel issues, and other ones don't. In fact, one of Plaintiff's own witnesses was actually stationed at a client. I think that was Mr. Goyne. So he was literally there to be talking to the client on a regular basis, again, representing Aerotech with the client. So those are a couple of examples. The issue of discretionary independent judgment, obviously, is one of the issues that is at place in the exemption. And there's all sorts of evidence in the record showing variation in those. So I think when you look at what the Court looked at, it all matters. It's not irrelevant. It's directly relevant to the things that the administrative exemption, the regulations, and the cases say you need to look at, specifically as to each person to determine if that person is or is not exempt. One thing I found interesting with the plaintiffs are talking about, you know, policies and procedures, and I think it absolutely is important to look at on the ground to see, as is taught by, for example, in the Marlow case, whether these policies are actually creating some sort of uniformity that would allow you to say, okay, we don't even need to look at people. We can just say, based on these policies and these procedures, we can now say these people are doing these things in these amounts of ways and with this amount of supervision. There is nothing in the policies that would allow you to make those kind of determinations. I think another thing that's important is under Marlow is what the Court says, is that the policies have to support a theory of misclassification. And here what I find striking is that the plaintiffs are, on the one hand, one of their key points of arguing why people are non-exempt is that they say they're not selecting people. They're not doing anything to exercise judgment in choosing people to be hired by customers. They're just doing routine screening. And yet this very perfect fit process, which is one of the policies that they keep talking about, that process is you are supposed to go out, recruiter, and use your judgment to find and select the best candidate for our client. And that's what this process is that they talk about, which would be the exact opposite of their theory of misclassification, that these people are just, you know, following a script and asking routine questions. You know, can you breathe? Okay, great. You know, I send you now on to my manager. So even their pointing to the policies wouldn't support any theory of misclassification. It would simply mean what they'd be arguing is that for their theory, people aren't following the perfect fit policy. They're instead just finding warm bodies. But again, that's not a way that you can certify this case. All that means is you'd have to then look individually, are people doing this sort of selection or are they not? And that's very important under the regulations, because we keep hearing talking about sourcing and screening. Screening is a very broad term. I mean, if you look at the actual evidence, that's everything from an initial phone interview that might well be routine, or as some of the witnesses said, even the phone interview might involve, you know, going in depth, tailoring questions, you know, doing an interview differently, even on the phone. That's on page 16 of our brief. But the point is that this very broad function of screening, what the regulations say and what the Department of Labor opinion letters say, is that even if someone is doing routine sourcing and screening, even if they're not doing anything that involves discretion and judgment, if they are after that process then making a selection, then everything that comes before is also exempt work because of the fact that work that is closely and directly related to exempt work also qualifies. So even if you were to say, this person is doing X amount of sourcing, that isn't going to answer the question of whether that sourcing is or is not exempt work unless you also go forward and find out, is that person then after that part of the process doing the sort of selectivity that the regulations and the opinion letters and the courts have said would make all of it exempt work? So, you know, simply to identify these functions doesn't answer the question, and this is why the district court correctly recognized that you absolutely have to go look at the evidence. What are people actually doing? And as she said during oral argument, it's all over the map. And her very carefully stated opinion goes through all of those issues, and that's exactly what is shown. So again, to simply say, well, people are trained, and oh, by the way, what the evidence was from a number of people, including plaintiff's own witnesses, is that the so-called training that is somehow going to allow a court to decide exactly what everybody's doing, they go through the written materials in a week or less, and they never look at them again. And what they all said was that the real training was after that. So that's just the first week. Then what they're doing is they're assigned to a recruiter lead for very specific training in their office. They're given training that is specific to their division. Their particular manager may have training that will come into play. So the idea that somehow this one week of going through computer training is now going to allow you to predict what everybody's doing, it's not reasonable to make that assumption. And the actual evidence in this case shows that that assumption is incorrect. With respect to the issue of supervision, what the court said is, yes, people are going to these red zone meetings, which, by the way, last about 15 minutes, and that everyone in the office attends. And the court correctly said that just because everybody is going to these meetings as a group isn't going to allow you to make a class-wide determination that all of them are subject to close supervision, when, as plaintiff's counsel says, he's claiming that they're working, you know, nine or ten hours a day. So two 15-minute meetings of the entire office, where everybody is sort of talking in general about what they're up to, that isn't evidence of a supervisor saying to a recruiter, okay, I'm now watching you, and you are doing this, and now you're doing that, and now you're doing this. It's just a general meeting. And the fact that there's one triangle meeting, which, again, is short, isn't evidence that you can say, okay, because people are having a meeting, I therefore can just conclude across the board that they're all being closely supervised. It's a meeting. You have to dig in and find out, okay, what's going on at the meeting? And what the record shows, sometimes these meetings are led by the recruiter. With respect to the red zone meetings, some offices will have the more successful recruiters get together and meet, you know, on their own. So the idea that you can make any sort of, you know, a class-wide finding, and the district court found that you couldn't. Are there members of this group that wouldn't qualify for the administrative exception? Well, I think the best way to answer that is if you simply look at one of the named plaintiffs and at the other named plaintiffs. The one we have is Mr. Andrade. And what he claimed during his deposition and his declaration is that he was just screening for minimum qualifications. That's what his manager told him to do. And he wasn't exercising discretion. If he is going to be believed, if a court were to find him to be credible, that would be a basis to find that he individually was not exempt. You then look at the other plaintiff, Mr. Delauder, who testified that he was making selection of candidates. He was doing in-depth interviews and evaluating and assessing people. And, in fact, the evidence about Mr. Delauder was presented to a district court in Maryland where he had a separate FLSA claim, which has very similar tests. And the court there found on a summary judgment ruling that Mr. Delauder was exempt. So that's an example right there that would show that to be able to say we're going to be able to make a global determination that everybody in this group is non-exempt isn't even borne out by the two named plaintiffs in this case, much less everybody else. I also wanted to point out when we talk about the compensation, what the record reflects is that recruiters, in addition to getting a base salary, they also earn incentive compensation. And some of them said that they could earn quite a lot of incentive compensation. So, first of all, even if it is $40,000, that's well above the amount needed for the California exemption test, which is, I think, around $32,000 to $33,000. But they were earning incentive compensation on top of that. So I just wanted to make sure that the record was clear there. I think one other point I just wanted to bring to the Court's attention, I know that the plaintiffs have said, oh, well, we could just do representative testimony or use formulas and experts to try this case, kind of conceding that they're not going to be able to have findings made across the board. In addition to Dukes obviously rejecting the whole idea of a trial by formula, there's a recent decision which is called Duran v. U.S. Bank, which is a California court of appeal case, 2012 Westlaw 366590, which only involved 260 employees. And there the court actually tried to try this type of a case using representative witnesses. And they put on, I don't know, about 20 people and said, all right, these 20 people are now going to determine everybody else. And that was the trial plan they went with and resulting in a verdict that was reversed by the court of appeal. The court of appeal cited to Dukes and they said, no, you cannot do it this way. To try to have 20 people's experiences determine whether all these other people are or aren't exempt when you have to look at all of these factors, all of these fact-specific issues, that's not good enough. And the court went beyond that. Not only did it reverse the verdict. It actually ordered the court to decertify the class because it says it's clear that this case never should have been certified in the first place. So under what circumstances, then, could you certify a class for administrative exemption? Sure. I think what you can look to, first of all, I realize it was in a different context, but if you look at the ruling, and it was either in Wells Fargo or Minoli, where the court talked about, you know, that was outside sales, and the court said if you have a policy that people are, you know, required to be inside 80 percent of the time, and the evidence actually is showing that that's what's going on, now you've got a basis to certify. So I think here the administrative exemption, if, in fact, you were to find a, for example, if Aerotech, instead of having a perfect fit process, it had a routine screening process, and that's what the training materials said people are doing, and that's what the evidence showed people actually were doing, that would be an example where you could say, well, okay, here's a case where based on the process that these employees are supposed to follow and the evidence that this is what they're doing, there's not evidence of discretion or work of substantial importance, but that's not the case here. We have a policy, and to talk about substantial importance, where your job is to find people and either recommend people to go to work for a company, or your job is to actually make decisions on that. To say that that's not something of substantial importance, when this is what this entire job is ultimately geared towards doing, there's no basis to make any sort of a finding here. In fact, the Department of Labor opinion letters make it clear that recruiters, if they're involved in these sorts of hiring decisions, they absolutely are, their role absolutely is substantially important to either the business of their employer or their employer's customers. So, again, the argument that that is somehow an issue I just don't think is borne out by any of the evidence. So those were, I think, the main points that I had to make, you know, in terms of the evidence here which talks about broad functions rather than anything that is then going to be able to allow you to say, all right, I now know. This recruiter here, this is what they're doing every day, and this recruiter over here, they're doing the same thing. To say that they're all, you know, involved in the recruiting process doesn't answer that question. It's simply a process that, as the district court very carefully found, within that process, there are numerous material variations every step of the way, as she said. Thank you for the argument. Thank you, Ron. Rebuttal? Yes. Okay, with respect to Duran, we had no prior knowledge that that was going to come up today, so we'd object to any discussion of that without the opportunity to address it in some other form. With respect to the two red zone meetings and the triangle meeting, collectively, that's about 45 minutes to an hour of direct supervision each day on short-term goals and whether or not people are following the checklists and forms for how the recruiters do the sourcing and screening, which comprises 50% of their time. At this point, it wouldn't appear that there's any dispute that the checklists and forms that we've discussed are, in fact, followed by the recruiters, and the sourcing and screening is very basic. It's comprised of collecting pre-set fields of information from people. Save with respect to the comment from Your Honor Judge Clifton earlier about Ramirez, and save on the California Supreme Court clarified that where there are standardized written procedures or checklists and training about job tasks and duties, that that can serve as a common proof regarding the employer's realistic expectations and requirements for a job, and that Ramirez was not to be understood as undermining the propriety of class certification where those kinds of written forms of policies and procedures were available. There is no evidence in the record, and there's no finding from the district court, that there is any training or checklist material that is division-specific or office-specific. The training and checklists that we've described are unitary, detailed, and comprehensive, and they're used across the company in California. Finally, I think we just note that there is no indication that recruiters have any involvement with recommendations for hire or hiring as part of the sourcing and screening process, which is 50 percent of their time. Any involvement with respect to recommendations for hire is part of submittal, which is a separate part of their job. The information is collected in sourcing and screening. It is then given to the account manager, who typically contacts the client and provides the benefit of the information from the sourcing and screening. So the recruiters are not typically involved in that process at all. Okay. And then finally, just going back to something I noted earlier, with respect to the commonality of the training and the checklists and the forms, recruiters cross-recruit across divisions based on that standardized procedure that's in place for the Aerotech recruiting process. They don't receive any additional written training, any additional written, excuse me, any additional verbal training when they go into a different office. They're able to pick up where they left off and apply the standard recruiting process, which identifies all the steps that they take for sourcing and screening candidates. On this record, we really do believe that there's good cause to believe that they are the personnel clerk in the regulations. And if that were based on this proof, it is quite possible that there could be a class-wide liability determination against the company in a trial. This would seem to be, therefore, a proper case for class treatment. Thank you. Thank you. Thank you. Thank you, both counsel, for your helpful and knowledgeable arguments. The case just argued is submitted. This concludes this morning's calendar. We're adjourned.
judges: Farris, Clifton, Ikuta